11631

HUGHES v. PALATINE INSURANCE COMPANY

SAME v. LONDON & LANCASHIRE INSURANCE CO.

(126 S. E., 125)

1. INSURANCE—TESTIMONY AS TO VALUE OF GOODS SHORTLY BEFORE FIRE AND AMOUNT OF SUBSEQUENT SALES HELD ADMISSIBLE IN ACTION ON FIRE POLICY.—In action on fire policy, testimony as to value of goods a short time before the fire and amount of sales since *held* admissible.

2. INSURANCE—EVIDENCE THAT DEFENDANT'S AGENT KNEW INSURED'S NONCOMPLIANCE WITH IRON SAFE CLAUSE HELD SUFFICIENT TO CARRY CASE TO JURY ON QUESTION OF WAIVER.—In action on fire policy, evidence that insurer's agent knew when he wrote policy for other company, three months previous to issuance of policy by defendant, that insured had no iron safe and that he told insured at such time that absence thereof was "all right," *held* evidence that defendant company had knowledge of insured's noncompliance with iron safe clause sufficient for submission to jury of question of whether company waived compliance therewith.

3. INSURANCE—FAILURE TO RETURN UNEARNED PORTION OF PREMIUM WHERE AVOIDANCE OF POLICY IS CLAIMED IS EVIDENCE OF WAIVER OF FORFEITURE.—Failure to return unearned portion of insurance premium, where avoidance of policy is claimed is evidence of waiver of forfeiture.

4. INSURANCE—WHETHER DEFENDANT WAIVED COMPLIANCE WITH IRON SAFE CLAUSE HELD FOR JURY.—In action on fire policy, whether defendant waived compliance with iron safe clause *held* for jury.

5. WITNESSES—ACTION OF COURT IN PERMITTING WITNESS TO READ
   REJECTED DUPLICATE INVOICES. UNDER GUISE OF REFRESHING MEMORY HELD ERROR.—In action on fire policy, action of Court in permitting witness, under the guise of refreshing his memory, to read rejected duplicate invoices, the originals having been destroyed by fire, was error, though witness stated that he could not remember the items, even with the use of the invoices.

6. APPEAL AND ERROR—ERRONEOUS USE OF MEMORANDUM BY WITNESS
   TO REFRESH MEMORY HELD HARMLESS IN VIEW OF OTHER EVIDENCE AS TO SAME FACTS.—In action on fire policy, action of Court in permitting witness to read from duplicate invoices under guise of refreshing memory, *held* harmless in view of other conclusive evidence as to facts shown thereby.

Before R. E. BABB, SPECIAL JUDGE, Greenwood, April, 1923.   Affirmed.

Consolidated suits by B. B. Hughes against the Palatine Insurance Company and against the London & Lancashire Insurance Company.   Judgment for plaintiff, and defendant appeals.

*Messrs. Smith, Hammond & Smith,* and *Mays & Featherstone,* for appellant, cite: *Competency of evidence:* 35 S. E., 775; 119 S. E., 338; 84 S. E., 311. *As to proof of loss:* 27 S. E., 780. *As to written instruments:* 14 S. C., 450; 113 S. E., 688; 119 S. C., 19; 15 S. C., 376. *As to parol evidence:* 115 S. E., 809. *Waiver:* 81 S. C., 152; 117 S. E., 211; 32 S. E., 598; 38 Cyc., 135. *Iron safe clause:* 27 S. E., 180; 36 S. E., 821; 84 S. C., 311; 32 S. E., 595; 80 S. W., 283; 97 S. W., 7; 93 S. E., 75; 78 S. C., 391; 78 S. C., 340. *Issues submitted to jury:* 38 Cyc., 1624. *Charge:* 100 S. C., 374; 75 S. C., 529. *As to iron safe clause:* 14 R. C. L., 260; 116 S. C., 437; 98 Ga., 761. *"Satisfy":* 7 Words & Phrases, 6332. *Objections to the admission of evidence:* 3 C. J., 823.

NOTE: On what books and inventories must be kept in a safe to comply with the requirements of the iron-safe clause, see note in 15 L. R. A. (N. S.), 471.

On conditions in fire insurance policy as to keeping, producing, and preserving books and papers, see notes in 51 L. R. A., 699; L. R. A., 1915F, 759.

*Messrs. Grier, Park & McDonald,* for respondent, cite: *Denial of liability waiver of right to require proofs of loss:* 55 S. C., 589; 51 S. C., 540; 37 S. C., 56; 115 S .C., 58; 26 C. J., 502. *Duplicates of written instruments:* 91 N. E., 265; 94 Ark., 227; 48 S. C., 577; 29 Ont. L., 33; 9 Wall., 677; Note 11, 26 C. J., 534. *Paper used to refresh memory:* 121 S. C., 237; 119 S. E., 21. *Testimony as to value of stock of goods:* 26 C. J., 535. *As to bank book:* 78 S. C., 433. *No grounds of objection stated:* 69 S. C., 434; 53 S. C., 80; 59 S. C., 243; 60 S. C., 15; 125 S. C., 220. *Competency of evidence:* 36 S. C., 215; 48 S. C., 223; 74 S. C., 246. *Waiver:* 115 S. C., 58; 29 S. C., 580; 79 S. C., 433. *Forfeiture—return of unearned premium:* 102 S. C., 129; 104 S. C., 403; 102 S. C., 313; 57 S. C., 358; 70 S. C., 295; 70 S. C., 82; 97 S. C., 375. *Judge's charge:* 78 S. C., 443; 96 S. C., 14.

December 13, 1924.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

"The plaintiff brought suit in each of the above cases on October 10, 1922, on policies of fire insurance for $2,000 each, issued by the respective defendants over a stock of merchandise, which was later burned. The cases were tried together by agreement in the Court of Common Pleas for Greenwood County at the April term, 1923, before Special Judge R. E. Babb and a jury. Verdict was found for the plaintiff in each case for $2,000, and judgment entered thereon, from which this appeal is duly prosecuted." The exceptions, 22 in number, raise the following questions: Competency of evidence; was the iron-safe clause breached? was the breach of the iron-safe clause waived? errors in the Judge's charge; and that the verdict was contrary to the law and evidence.

We see no error in the admission of the evidence as complained of. The appellants denied their liability to pay the

policies, and that waived the right to require proof of loss, and the record shows that proper proof of loss was filed. There was no error in admitting copies of invoices; the originals were burned up; but, as a matter of fact, the record shows that the duplicate invoices were not admitted in evidence, but the witness only used them to refresh his memory, and then testified from his own memory; there was other evidence from other witnesses as to the value of the stock of goods destroyed, to wit, Spivey, McCord, Stalnaker, and Hasting. *Gwathmey v. Foor Hotel Company,* 121 S. C., 237; 113 S. E., 688. *Copeland Company v. Davis* (S. C.), 119 S. E., 21. *Truck Growers' Association v. S. A. L. Railway* (S. C.), 121 S. E., 564.

1   We see no error in allowing evidence of witnesses to show the value of the goods a short time before the fire and the amount of sales since. That was for the jury to consider. *26 Corpus Juris,* 535, states:

"Where the value of the property injured or destroyed is in issue, any competent evidence either direct or circumstantial, is admissible which tends to show such value, and testimony as to such value is competent, notwithstanding insurer has the right to demand the production of inventories and books which the policy required insured to keep." *McMillan v. Insurance Company,* 78 S. C., 433; 58 S. E., 1020, 1135.

There is no doubt that there was a breach of the iron safe clause, and that the respondent did not make the inventory as far as one policy was concerned in 30 days. Any evidence showing a waiver on the part of the company as to the breach of these conditions was competent. The evidence tended to show knowledge on the part of the defendant's agent, Graham, who wrote the policies and delivered them to the respondent, that he did not have a safe, and the manner in which his books were kept.

2   The evidence was sufficient to carry the case to the jury for their determination, as to whether there was evidence to show knowledge on the part of the

defendant's agent of the forfeiture and its consequent waiver. *Pelzer v. Sun Fire Office,* 36 S. C., 215; 15 S. E., 562. *Graham v. Insurance Company,* 48 S. C., 223; 26 S. E., 323; 59 Am. St. Rep., 707. *Pearlstine v. Insurance Company,* 74 S. C., 246; 54 S. E., 372.

The inventory was taken in 30 days after the London & Lancashire issued its policy. The other company issued its policy on September 30th, and no inventory as to it was taken until the following January. As to forfeiture, Mr. Justice Hydrick said:

"The Courts are generally inclined to hold the insurer to the performance of his contract, and to prevent, as far as it can be done in reason and justice, an unfair reliance on his part upon technical conditions of the contract to defeat it, because the Courts lean against forfeitures. In respect of such conditions a law of waiver or estoppel, which may be said to be peculiar to insurance contracts, has grown up. If and when they are of substantial merit they will be enforced; but the Courts are not inclined to allow them to operate merely as snares for the unwary."

The defendants did not return or offer to return the premium unearned after suit was brought or during the trial. Mr. Justice Gage in *Scott v. Insurance Company,* 102 S. C., 129; 86 S. E., 489, says:

"It may be the company might, under the contract, have returned the pro rata of the unearned premium, demanded the surrender [of the policy] and insisted upon the forfeiture. It did not choose to do that, and its election to not do it was properly submitted to the jury as some evidence of an intention not to stand upon the words of the contract about a surrender and return of unearned premium."

Failure to return unearned portion of insurance premium where an avoidance of the policy is claimed is evidence of waiver of forfeiture. *Spence v. Assurance Co.,* 104 S. C., 403; 89 S. E., 319. *Etheredge v. Insurance Co.,* 102 S. E., 313; 86 S. E., 687. *Norris v.*

*Insurance Co.,* 57 S. C., 358; 35 S. E., 572. *Madden v. Insurance Co.,* 70 S. C., 295; 49 S. E., 855. *Pearlstine v. Insurance Co.,* 70 S. C., 82; 49 S. E., 4. *Powell v. Insurance Co.,* 97 S. C., 375; 81 S. E., 654.

The evidence shows that the appellants, having knowledge that Hughes was not complying with the provisions of the "iron-safe" clause, instructed their agent, Graham, to cancel the policies. Graham neglected to do this. The action of the adjuster was sufficient to carry the case to the jury, taken with all of the evidence in the case as to waiver. We see no error on the part of his Honor in his charge to the jury as complained of.

All exceptions are overruled, and judgment affirmed.

MR. JUSTICE FRASER and MR. ACTING ASSOCIATE JUSTICE P. F. HENDERSON concur.

MESSRS. JUSTICES COTHRAN and MARION dissent.

MR. CHIEF JUSTICE GARY did not participate.

MR. ACTING ASSOCIATE JUSTICE P. F. HENDERSON (concurring): Before the reargument herein was ordered an opinion by Mr. Justice Watts, concurred in by Mr. Justice Fraser, was filed ordering the affirmance of the judgments herein, and a dissenting opinion by Mr. Justice Cothran, concurred in by Mr. Justice Marion, was likewise filed, which held that there should be a reversal. In view of this contrariety of opinion, I was designated to participate in the rehearing, and in the resultant decision of these appeals.

Under these circumstances, I shall not attempt to discuss all of the somewhat complicated questions involved herein, but shall content myself solely with stating my opinion as to those matters upon which I have found the Court equally divided.

As I understand it, there are two of these debated issues: (1) Should a verdict have been directed in favor of the London & Lancashire Insurance Company? and (2) was there reversible error in the use in the trial of the duplicate invoices? As to the first question:

Assuming that there was a violation of the iron-safe clause, the issue presented is whether there is in the record sufficient evidence of waiver to take the case to the jury. Mr. Justice Watts holds simply:

"The evidence tended to show knowledge on the part of the defendant's agent, Graham, who wrote the policies and delivered them to the respondent, that he did not have a safe, and the manner in which he kept his books."

In the dissenting opinion Mr. Justice Cothran states that he yields his views "for the moment," to the binding authority of the *Madden Case,* 70 S. C., 295; 49 S. E., 855, and the doctrine therein established, viz., that, where an insurance agent represents two companies, knowledge obtained by him in the preparation and issuance of a policy in one company will be imputed to the other company. H. M. Graham, the agent herein, represented both of the defendant companies. He issued the policy in the Palatine Company in September, 1920, and in the London & Lancashire Company (hereinafter referred to as the Lancashire Company) in December, 1920. In the dissenting opinion it is held that there was in the *Lancashire Case* a compliance with the requirement as to an inventory, and a waiver of the requirement as to the keeping of a set of books, but that there was no evidence of waiver of the requirement as to an iron safe, for the reason that:

The Lancashire Company "could only be charged with the knowledge of Graham that, when the Palatine policy was issued three months before the London & Lancashire policy was issued, the plaintiff did not have an iron safe; it could not be charged with any conduct of Graham while acting for another company, upon an entirely different transaction from which it might be inferred that the other company intended to waive *future* compliance with the requirement."

This difference of opinion presents the main question for consideration.

My application, to the present appeal, of the doctrine of the *Madden Case,* the authority of which I recognize, and the reasoning of which I approve, is that there was imputed to the Lancashire Company in December the *exact information* which the agent of both companies had in September when he wrote the Palatine policy. The dissenting opinion herein exceedingly accurately states what this knowledge of the agent in question was, as follows:

"The evidence also tends to show that at that time the plaintiff informed Graham that he did not have an iron safe in which the inventories and books were to be kept; that Graham repled: 'That is all right.' He not only did not object to the absence of the safe, but approved it. It may not have been an unnatural inference that the absence of the safe was *'all right'* during the continuance of the policy." (Italics mine.)

I fully agree with the foregoing statement and the suggested inference which might be drawn from the same, viz., that from the alleged remark of Graham the plaintiff might reasonably infer that, for the purposes of insurance, the absence of an iron safe was "all right" *during the whole period of continuance of the Palatine policy,* which would exist until September, 1921. It is my further opinion that if Graham, and through him the Lancashire Company, for whom he was then acting, knew in December that he (Graham) had been informed in September that the plaintiff then had no iron safe, and that Graham had replied, "That is all right," and thereby induced the plaintiff to conclude that the absence of the safe was "all right during the continuance of the policy," to wit, from September, 1920, to September, 1921, which period covered the date of the issuance of the Lancashire policy, and also the date of the fire, then I think and hold that the issuance of the policy and the collection of the premium from the plaintiff, with this knowledge present in Graham's mind, and with this knowledge imputed by law to the Lancashire Company, constituted evidence of waiver.

I am not unmindful of the doctrine enunciated by this Court in the cases of *McCarty v. Insurance Co.,* 81 S. C., 152; 62 S. E., 1; 18 L. R. A. (N. S.), 729, and *Feagin v. Insurance Co.,* 122 S. C., 532; 115 S. E., 808, to the effect that knowledge by an agent of the intention of the insured to violate his policy in the future will not constitute evidence of waiver; but I consider that the distinction between these decisions and the present case is obvious. Herein the agent had before December, 1920, as an accomplished fact led Hughes to suppose that for insurance purposes an iron safe would not be required for the year running from September, 1920, to September, 1921. This accomplished fact, which is relied upon as evidence of waiver, had nothing to do with future conditions or future happenings.

Furthermore, I think and hold that there was other evidence of waiver. Graham in December, according to plaintiff's testimony, visited the store, which was a very small establishment, measuring 20 feet by 47 feet, in which an iron safe, if it had existed, would have been a very imposing article of furniture. Plaintiff testified that Graham looked over the stock, estmated its value, and was told that the same system of bookkeeping—the McCaskie system—which does not call for an iron safe, but which is operated in connection with an iron case or box, was still in use as it was upon his first visit, at which time he had been specifically informed that the plaintiff had no safe. The witness, Spivey, testified in giving his version of the conversation had between Graham and the plaintiff on this occasion, as follows:

"He (Graham) asked what system did he have for bookkeeping, and he (the plaintiff) showed him the McCaskie, and told him *that he had nothing but the McCaskie.*"

Again, defendant's witness, Reynolds, who wrote the Lancashire policy, testified that he and Reeves, an inspector for the Lancashire Company, went in February, 1921, to plaintiff's store on an inspection tour, which inspection was to include, "not only the building, *but the contents thereof.*"

26—S. C. R., 130

Reeves stated that on this visit he "inspected his (the plaintiff's) store," looked over his stock of goods, suggested changes in his store, and inquired about his books.

In all this, I think and hold that there was evidence upon which a jury might reasonably conclude that, although the iron safe was not specifically mentioned, Graham, Reynolds, and Reeves must all have known that there was no iron safe in plaintiff's small store.

As to the second question:

Plaintiff in an endeavor to figure his loss wrote to the dealers from whom he had bought his goods, and produced supposed copies of his invoices procured from said dealers, the originals having been destroyed in the fire. Plaintiff did not attempt to testify as to the accuracy of the duplicates, and had not examined *de bene esse* the dealers who made them. The presiding Judge properly ruled that, not being proven, these duplicate invoices could not be introduced in evidence. He, however, allowed plaintiff, under the guise of refreshing his memory, to read these rejected duplicate invoices in evidence. This was done, although plaintiff frankly stated that neither he nor "any other man" could remember the items, even with the use of the duplicate invoices. This, in my opinion, was error. *Gwathmey v. Foor Hotel Co.,* 121 S. C., 237; 113 S. E., 688. *Copeland Co. v. Davis,* 125 S. C., 449; 119 S. E., 19.

The final question, which presents considerable difficulty, is whether or not this ranks as prejudicial error and necessitates a reversal of the judgments herein. The case of *Beaufort Truck Growers' Association v. Railway* (S. C.), 121 S. E., 554, is strikingly similar to the present case. This Court therein sustained an exception to the Circuit Court allowing a witness, Boller by name, to testify from a memorandum made by another person, which memorandum Boller testified did not in fact refresh his memory. Hence the Court held that Boller's testimony was erroneously admitted, but the Court refused to reverse the judgment on account of this error, holding:

"But, inasmuch as there is enough evidence without this to sustain the verdict of the jury, we are of the opinion that the admission of this evidence was not prejudicial, and the judgment should be affirmed."

In *Edgefield Manufacturing Co. v. Casualty Co.,* 78 S. C., 73; 58 S. E., 969, this Court held that the presiding Judge therein erred in excluding a deposition taken in defendant's favor. Plaintiff recovered judgment. Upon appeal this Court refused, despite the error, to reverse the judgment, holding:

"But this Court should not order a new trial where from an examination of the record it has no doubt the verdict of any fair jury would have been the same, even if no error had been committed."

In the present cases, in addition to the erroneously admitted testimony, and in addition to his and his clerk's estimate of the value of the goods in the store at the time of the fire, plaintiff presented the testimony of three traveling salesmen, each of whom had visited the store "within a short time" before the fire. Each of these traveling salesmen, who were presumably versed in mercantile affairs, estimated that the worth of the merchandise then in the store was between $5,000 and $6,000. The defendant introduced absolutely no testimony to contradict these estimates.

It is true that the plaintiff was asked on cross-examination if a paper which was shown him was a copy of his tax return, to which he replied that he did not know. He was then asked if he did not return $820.42 as the amount of his inventory on January 1, 1921, to which he replied that he supposed so, but he immediately asked his questioner, "You went to the books, didn't you?" No reply was made to this question, and no proof was offered as to the correctness of the paper in question or that it came from "the books." The plaintiff then upon redirect examination was asked if he had any recollection of the correctness of the aforesaid figures. To this he replied: "No, sir; I told him

Mr. Justice Cothran (dissenting) : I think that the errors upon the trial of this case demand a new trial, and, therefore, dissent from the affirmance announced in the opinion of Mr. Justice Watts.

The plaintiff held two policies of fire insurance upon his stock of goods; one was issued by the Palatine Company on September 30, 1920, for $2,000, the other by the London & Lancashire Company on December 23, 1920, also for $2,000. The stock of goods was destroyed by fire on June 27, 1921, within the period of insurance. The companies declined to pay the loss, and on October 10, 1922, separate suits were instituted. At April term, 1923, the two cases were tried together before Hon. R. E. Babb, Special Judge, and a jury. The trial resulted in verdicts in favor of the plaintiff upon both complainants, and from judgments entered thereon the defendants have appealed.

The defendant's defense in each case was a violation by the insured of what is commonly termed the "iron-safe" clause in the policies, which, in brief, requires the insured:

(1) To take a complete itemized inventory of his stock of goods on hand at least once a year.

(2) If such inventory shall not have been taken within the year prior to the date of the policy, to take it in detail within 30 days of its issuance.

(3) To keep a set of books which shall present a complete record of business transacted, including purchases, sales, and shipments, both for cash and credit, from the date of the inventory, and during the continuance of the policy.

(4) To keep his books and the inventory locked in a fireproof safe at night, or when the building is not actually open for business.

(5) Should the insured fail in the preceding requirement, he must keep the books and inventory in some place not exposed to a fire which would destroy the building in which the stock of goods insured was kept.

he had the record." It is evident that the plaintiff meant to make no admission except of what the record itself would show. Neither the record nor a copy of it was proven or offered in evidence, nor was any proof whatsoever presented of the authenticity of the paper upon which plaintiff was questioned. I do not consider that this colloquy was effectual to draw from the plaintiff an admission of his tax return, even if it should be admitted that this would have constituted a counter showing to plaintiff's testimony of the value of his stock of goods in June, 1921. It is further true that there is in the record an exceedingly vague notation of the existence of some testimony, which is not set out, of some unstated quantity of goods having been removed from the store before the fire, "which issue," the record states, "is not raised by the exceptions." The record further fails to show that this alleged removal was accomplished after the estimates were made of the value of the stock, which estimates were made "shortly" before the fire; hence the Court may assume that this testimony did not constitute a contradiction of the aforesaid estimates.

Hence, eliminating completely the erroneously admitted testimony, we have the estimates of five witnesses, all versed in merchandising, before the jury, to the effect that the goods destroyed were worth from $5,000 to $7,000, which testimony was not contradicted. In other words, the only testimony before the jury on this subject, be its probative value weak or strong, was to the effect that the value of the destroyed stock of goods was in excess of the insurance.

Under these circumstances, found to exist in this particular case, and under the decisions of this Court herein cited, the error hereinbefore pointed out in the use of the duplicate invoices was not, in my opinion, prejudicial, and did not constitute reversible error. For these reasons I concur in the opinion of Mr. Justice Watts, affirming the judgment below.

The Palatine policy was dated September 30, 1920, and the London & Lancashire, December 23, 1920.   The insured claims to have taken an inventory on January 2, 1921, which was within 30 days after the London & Lancashire policy was issued, but not within that time after the Palatine was issued.

In what immediately follows, I shall take up the Palatine policy separately, and later refer to the other.

It is conceded that the insured had not taken an inventory of his stock within the year prior to September 30, 1920, the date of the Palatine policy, and that he did not take an inventory within 30 days thereafter; that he did not keep a set of books as required by the third subdivision above set forth; that he did not have an iron safe in his store. He did not have books, inventory, or safe, and hardly could be expected to keep in a safe which he did not have, books and inventory which never existed, or to keep them in some other place not exposed.

The plaintiff countered to these conceded grounds of forfeiture by alleging that the Palatine Company has waived its right to insist upon them.

The circumstances upon which he relies to establish his contention, that the question of waiver was properly submitted to the jury, are as follows:

(1) That, at the time the Palatine policy was issued, the agent, Graham, knew that the plaintiff had not taken an inventory, did not keep a set of books, and had no safe.

(2) That Reeves, the inspector for the London & Lancashire, was in his store during the life of the policy, and was informed that the plaintiff did not keep a set of books, and had no safe.

(3) That Redding, the adjuster for both companies, applied for a nonwaiver agreement, and was given one limited to the matter of the cancellation of the London & Lancashire policy; that he then proceeded with an investigation of the loss.

(4) That the Palatine had not returned the unearned premium.

*As to the first circumstance:*

The evidence tends to show that when the agent, Graham, solicited the insurance in the Palatine Company, he was in the plaintiff's store where the conditions surrounding the plaintiff's business were open to his view; that he asked the plaintiff if he had an inventory; that he was told that he did not; that Graham said: "I don't reckon it is necessary to have an inventory; there is sufficient goods here"; that Graham estimated the value of the stock at $4,000.00, and wrote a policy for $2,000.00. If this be true, and for the purposes of the appeal it must be assumed to be so, while Graham's statement undoubtedly was made in reference to the amount of insurance to be carried, and not to any provision in the policy, it may not have been an unnatural inference for the plaintiff to draw that the inventory was unnecessary for any other purpose. Graham denied this statement, and testified that the plaintiff promised to take an inventory within 30 days, although it does not appear that any effort was made by him between that date and the fire to see that the promise was fulfilled.

The evidence also tends to show that at that time the plaintiff explained to Graham the method he used in keeping a record of his business, the McCaskie system, as it is called, which admittedly does not comply with the requirement that the insured shall keep a set of books which shall present a complete record of business transactions, purchases, sales, cash, and credit, etc. It does not appear that Graham interposed any objection to the method used by the plaintiff, and it may not have been an unnatural inference that it was sufficient.

The evidence also tends to show that at that time the plaintiff informed Graham that he did not have an iron safe in which the inventories and books were to be kept; that Graham replied, "That is all right." He not only did

not object to the absence of the safe, but approved it. It may not have been an unnatural inference that the absence of the safe was "all right" during the continuance of the policy.

There is also evidence tending to show that Graham returned to the plaintiff's store in December, and solicited insurance with the London & Lancashire Company, and at that time, three months after he had issued the Palatine policy, knew that the same method of keeping business records was in force, without objection on his part, and that he said nothing about the iron safe or inventory.

I think that there is enough evidence tending to show a waiver, in this circumstance, to justify a submission of the question to the jury. The defendant insists that the conversation between Graham and the plaintiff occurred a year before, when the first policy was taken out, and so Graham testifies. It strikes me that that makes matters worse for the company, as Graham then had a whole year to ascertain whether or not the conditions were complied with, and, without satisfying himself as to this, renewed the policy for another year.

*As to the second circumstance:*

The information received by Reeves, the inspector for the London & Lancashire Company, cannot be imputed to the Palatine Company.

*As to the third circumstance:*

The adjuster for both companies was sent to Greenwood under specific instructions to proceed with the investigation under a non-waiver agreement. When he asked for it, he was given one which was limited to the matter of cancellation of the London & Lancashire policy, which has not been made a question in the case. He then went to the plaintiff, and as soon as he learned that the plaintiff had no inventory of his stock, and nothing to show his cash sales except the bank deposit account, he again asked for the non-waiver agreement and, upon refusal, left.

I think there is nothing in this circumstance which would justify the submission of the question of waiver to the jury.

*As to the fourth circumstance:*

I think that the true rule upon this subject is expressed in *Pearlstine v. Insurance Co.,* 70 S. C., 75; 49 S. E., 4. *Young v. Insurance Co.,* 68 S. C., 387; 47 S. E., 681. *Norris v. Insurance Co.,* 55 S. C., 450; 33 S. E., 566; 74 Am. St. Rep., 765. *McBryde v. Insurance Co.,* 55 S. C., 589; 33 S. E., 491; 74 Am. St. Rep., 769; note to 25 L. R. A. (N. S.), 1 (quoted) by the writer in *Whaley v. Insurance Co.,* 124 S. C., 173; 117 S. E., 209) ; and is substantially this : The question whether or not the failure to return the unearned part of premiums shall be considered evidence of a waiver of a forfeiture depends upon the time at which notice of the breach has been brought to the company. If before the loss, it is evidence tending to show a waiver; if after the loss, not. The reason for the rule, so clearly stated in the above extracts, need not be here repeated.

As there is evidence tending to show that the company had notice *before the loss* of the breach now relied upon, the failure to return the premium is some evidence tending to show a waiver, which required submission of that issue to the jury.

It is insisted by the insurance company that the iron safe clause contains "promissory warranties," and that a knowledge of conditions existing at the time the policy is issued cannot be construed into a waiver of prospective duties. This is generally true; but where, from that knowledge or from statements made by the agent at the time, a reasonable inference may be drawn by the insured that these prospective duties will not be required, the waiver of them is as complete as of an existing condition.

So much for the motion for a directed verdict in favor of the Palatine Company, which, I think, was properly refused.

Next, in reference to the motion on behalf of the London & Lancashire Company for a directed verdict:

The circumstances upon which the plaintiff relies as evidence of waivers of the three conditions in the "iron-safe clause" are the same as in the case of the Palatine Company.

*As to the first circumstance:*

The plaintiff seeks to impute to the London & Lancashire Company the knowledge acquired by Graham while he was acting as agent of the Palatine Company, in reference to the absence of inventories, the failure to keep a set of books, and the failure to have an iron safe in which these papers should be kept. I have considerable doubt as to this proposition, upon the principle that only such knowledge as may have been acquired by the agent in the course of his agency can be imputed to the principal (*2* Joyce, Ins., § 544. *Cobb v. Insurance Co.,* 78 S. C., 388; 58 S. E., 1099); but as the question appears to be decided contrary to my impression, in the case of *Madden v. Insurance Co.,* 70 S. C., 295; 49 S. E., 855, I yield, for the moment, my doubts to the authority of that decision.

Now, as to the inventory: The plaintiff claims to have taken an inventory on January 2, 1921, which was within 30 days after the issuance of the policy; he does not rely upon a waiver of this requirement, but insists upon his compliance therewith; so the matter of waiver in this connection disappears from consideration. And, even though it could be considered, the London & Lancashire Company could only be charged with the knowledge of Graham that, at a time three months before its policy was issued, an inventory had not been taken within the past year; it could not be charged with any conduct of Graham, while acting as agent of another company, upon an entirely distinct transaction, from which it might be inferred that the other company intended to waive future compliance with the requirement.

Next, as to the keeping of a set of books: The same observations are pertinent to the knowledge of Graham acquired while he was acting for the Palatine Company in

regard to this matter; but the evidence tends to show that, when he solicited the insurance with the London & Lancashire Company, he acquired the same information as to the method adopted for keeping a record of the business, as he did formerly when the Palatine policy was issued; which, as in the case of that policy, was some evidence of waiver.

Next, as to the iron safe:  The London & Lancashire Company could only be charged with the knowledge of Graham that, when the Palatine policy was issued three months before the London & Lancashire policy was issued, the plaintiff did not have an iron safe; it could not be charged with any conduct of Graham, while acting as agent for another company, upon an entirely different transaction, from which it might be inferred that the other company intended to waive *future* compliance with the requirement.

*As to the second circumstance:*

It appears without controversy that Reeves, an inspector of the London & Lancashire Company, went to the store of the plaintiff before the fire, for the purpose of inspecting the risk, and that while there he asked about the books kept by the plaintiff; the plaintiff showed him the McCaskie system, with which he shows by his testimony he was familiar. The defendant insists that Reeves was sent there merely to inspect the fire hazard.  His testimony refutes this contention, as he admits that he asked about the books.  It was a question for the jury whether or not his inspection covered other matters than the fire hazard, and, if it did, the company would be charged with knowledge acquired by him.  There was evidence, therefore, that the company, before the fire, knew that the plaintiff was not complying with the requirement as to keeping books, and whether that constituted a waiver of the agreement was a question for the jury.

*As to the third circumstance:*

The foregoing observations in connection with the Palatine policy are equally applicable to the London & Lancashire.

*As to the fourth circumstance:*

The same may be said of this.

I think, therefore, that there was sufficient evidence to require a submission of the question to the jury, as to a waiver of the requirement that a set of books be kept; but that there was no such evidence as to a waiver of the requirement an iron safe be kept, within which the inventories and books, such as they were, should be placed at night; and that for this reason the motion of the London & Lancashire Company for a directed verdict should have been granted.

Both of the defendants assign error in permitting the plaintiff to read into the record the duplicate invoices, under the pretense of testifying from memory as to the quantity and value of the goods indicated thereon.

The plaintiff had flagrantly violated every reasonable provision of the policies, intended to supply the means of information upon which a settlement of his actual loss could be made; he took no inventory, except that of January, 1921; he kept no books showing his purchases and sales; he kept no safe in which the papers which might have supplied this information should have been preserved; he provided no other place in which they could be kept. The original invoices of purchased goods were destroyed in the fire; he attempted to meet the situation in this way; taking the inventory of January, 1921, as a basis, he proposed to add thereto the purchases made between that date and the fire, and to deduct therefrom his cash sales, thus:

Inventory January 2, 1921 _____$ 5,710.47
Invoices and freight from January 2, 1921, to
  June 17, 1921 (date of fire) _____ 10,289.79

                                                         $16,000.26
Sales during the same period, less 15 per cent.
  profit and goods on hand_____:_____ 8,255.56

    Net value _____$ 7,744.70

The plaintiff procured from the sellers duplicate invoices, and offered them in evidence. Upon objection the Circuit Judge excluded them, upon the ground that they could only be proved by the person who made them as original evidence. Counsel for the plaintiff then, one by one, handed the duplicate invoices to the plaintiff on the stand, and, over objection of counsel for the defendants, the Court allowed the plaintiff to read from them and testify that he had purchased the goods at the prices indicated thereon. The plaintiff did not pretend to testify from memory; in fact admitted that he was not doing so, and his testimony shows that he testified only from the information afforded by the papers themselves. I think that this method of examination was a palpable evasion of the ruling excluding the invoices as evidence, and a plain violation of the rule in reference to refreshing memory from written papers.

The rule by this time should be considered settled that, where the witness has made a memorandum himself of a transaction, substantially contemporaneously therewith, he may testify from the writing, and it may be introduced in evidence, although he may not at the time of testifying have a recollection of the matter; but, where he has not made the writing himself, the paper cannot be used except where the witness after referring to it speaks from his own memory. *Gwathmey v. Foor Co.,* 121 S. C., 237; 113 S. E., 688. *Copeland Co. v. Davis,* 125 S. C., 449; 119 S. E., 19, and cases cited, particularly in the first case.

The question in this case is not as to the admissibility of the paper in evidence, for it was excluded, but whether the witness shall in manifest evasion of the rule be permitted to use the paper at all. What would be the efficacy of the rule, if the witness should be allowed to get before the jury, the facts stated in the paper which he did not make and could not possibly have remembered? In answer to the question: "Independently of these figures, you could not have told (what was bought)?" the plaintiff replied: "No, sir; and no other man."

It is no reply to the inadmissibility of this evidence to say that other witnesses testified to the value of the stock. The other witnesses were men casually in the store, and testified after a necessarily cursory examination, giving only an estimate. The documentary evidence of the invoices, if properly proved, was worth a dozen of such estimates, and having been practically admitted, improperly, there was manifest error.

There are other matters which I do not deem it necessary to discuss. The exceptions of the defendants numbered 8, 9, 11, 12, assigning error in not charging admitted facts, are well taken.

For these reasons I think that the judgment should be reversed and a new trial had. The Court might well order a directed verdict in favor of the London & Lancashire Company, but, as the motion was made upon a defect of proof which may be supplied, a new trial is to be preferred under Rule 27.